UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Starr International Company, Inc., <br><br> Plaintiff, <br><br> v. <br><br> American International Group, Inc., <br><br> Defendant, | Civil Action No. 05 CV 6283 (BSJ) <br><br> **ANSWER TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIMS OF AMERICAN INTERNATIONAL GROUP, INC.** |
| American International Group, Inc., <br><br> Counterclaim-Plaintiff, <br><br> v. <br><br> Starr International Company, Inc., <br><br> Counterclaim-Defendant. | |

Defendant, American International Group, Inc. ("AIG"), by its attorneys Paul, Weiss, Rifkind, Wharton & Garrison LLP, for its Answer to plaintiff Starr International Company, Inc.'s ("SICO") Complaint (the "Complaint"), states as follows:

1.      AIG denies the allegations asserted in paragraph 1.

2.      AIG denies the allegations asserted in paragraph 2, except admits that approximately 12% of the outstanding common stock of AIG is owned by SICO, and that AIG does not own SICO stock.

3.      AIG denies the allegations asserted in paragraph 3, and denies knowledge or information sufficient to form a belief as to the truth of the allegations with respect to SICO's current location, except admits that SICO has, until earlier this year, utilized office space in AIG buildings in Bermuda and the Republic of Ireland.

4.      AIG denies the allegations asserted in paragraph 4, except admits that individuals purporting to represent SICO have made requests upon AIG for property they allege to be owned by SICO.

5.      AIG denies the allegations in paragraph 5, and avers that the allegations state legal conclusions and therefore no response is necessary.

6.      AIG denies knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 6.

7.      AIG admits the allegations asserted in paragraph 7.

8.      AIG denies knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 8, except admits that AIG is a Delaware corporation with its principal place of business in the State of New York.

9.      AIG admits the allegations asserted in paragraph 9.

10.     AIG denies knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 10.

11.     AIG denies knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 11.

12.     AIG denies knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 12, except admits that, until March 2005, SICO used office space at AIG buildings in Richmond, Bermuda and Dublin, Ireland.

13.     AIG denies the allegations asserted in paragraph 13, and denies knowledge or information sufficient to form a belief as to the truth of the allegations asserted with respect to what SICO learned.

2

14.     AIG denies knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 14, except denies that AIG representatives removed files belonging to non-AIG companies.

15.     AIG denies knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 15.

16.     AIG denies knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 16.

17.     AIG denies the allegations asserted in paragraph 17, except admits that it possesses an inventory of an art collection.

18.     AIG denies the allegations asserted in paragraph 18.

19.     AIG denies the allegations asserted in paragraph 19.

20.     AIG denies the allegations asserted in paragraph 20.

21.     AIG denies the allegations asserted in paragraph 21.

22.     AIG denies the allegations asserted in paragraph 22, except admits that individuals purporting to represent SICO have made requests upon AIG for property they allege to be owned by SICO.

23.     AIG denies the allegations asserted in paragraph 23.

## COUNT ONE

24.     AIG repeats and reasserts its responses contained in paragraphs 1 through 23 of this Answer.

25.     AIG denies the allegations asserted in paragraph 25, except admits that it possesses an inventory of an art collection.

26.     AIG denies the allegations asserted in paragraph 26, except admits that individuals purporting to represent SICO have made requests upon AIG for property they allege to be owned by SICO.

27.     AIG denies the allegations asserted in paragraph 27.

28.     AIG denies the allegations asserted in paragraph 28.

29.     AIG denies the allegations asserted in paragraph 29.

30.     AIG denies the allegations asserted in paragraph 30.

## COUNT TWO

31.     AIG repeats and reasserts its responses contained in paragraphs 1 through 30 of this Answer.

32.     AIG denies the allegations asserted in paragraph 32, except admits that it possesses an inventory of an art collection.

33.     AIG denies the allegations asserted in paragraph 33, except admits that individuals purporting to represent SICO have made requests upon AIG for property they allege to be owned by SICO.

34.     AIG denies the allegations asserted in paragraph 34.

35.     AIG denies the allegations asserted in paragraph 35.

36.     AIG denies the allegations asserted in paragraph 36.

37.     AIG denies the allegations asserted in paragraph 37.

38.     For further and separate defenses to the causes of action alleged in the Complaint, without admitting that it has the burden of proof on any of these matters, and reserving its rights to supplement or amend this Answer and counterclaims, AIG alleges as follows:

4

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

39.     Plaintiff is barred from obtaining relief by its own wrongful, inequitable conduct and unclean hands.

### SECOND AFFIRMATIVE DEFENSE

40.     Plaintiff is barred from obtaining relief because Plaintiff has engaged in unfair dealing with AIG.

### THIRD AFFIRMATIVE DEFENSE

41.     Plaintiff is equitably estopped from asserting the claims in the Complaint.

### FOURTH AFFIRMATIVE DEFENSE

42.     Plaintiff is barred from obtaining relief by the doctrines of laches and waiver.

### FIFTH AFFIRMATIVE DEFENSE

43.     Plaintiff's claims are barred, in whole or in part, because Plaintiff provided consent, impliedly or expressly, to the actions taken as alleged in the Complaint.

### SIXTH AFFIRMATIVE DEFENSE

44.     Plaintiff is barred from obtaining relief because AIG acted in good faith and with due care during all times relevant to the Complaint.

### SEVENTH AFFIRMATIVE DEFENSE

45.     Plaintiff's claims are barred, in whole or in part, because AIG has acted under authority of law, and by the authority of valid process.

## EIGHTH AFFIRMATIVE DEFENSE

46.     Plaintiff's claims are barred, in whole or in part, because Plaintiff has suffered no injury or damages as a result of the acts alleged in the Complaint.

## NINTH AFFIRMATIVE DEFENSE

47.     To the extent that Plaintiff may have sustained any injury or damage, such injury or damage was caused by Plaintiff's own negligence and culpable conduct and/or the negligence and culpable conduct of entities or individuals other than AIG.

## TENTH AFFIRMATIVE DEFENSE

48.     A substantial portion of plaintiff's assets are being held for the benefit of AIG and its current and future employees.  Moreover, Plaintiff has committed to pay hundreds of millions of dollars to AIG and its employees and will continue to owe hundreds of millions of dollars to AIG and its employees into the future.  To the extent that Plaintiff asserts any claim, such claim is off-set by the moneys owed to AIG and its employees under the counterclaims below.

## ELEVENTH AFFIRMATIVE DEFENSE

49.     Plaintiff fails to state a claim upon which relief may be granted.

## COUNTERCLAIMS

For its counterclaims against Counterclaim-Defendant Starr International Company, Inc. ("SICO"), Counterclaim-Plaintiff American International Group, Inc. ("AIG"), by its undersigned attorneys, alleges, of its own personal knowledge and otherwise on information and belief, as follows:

## Nature of Action

1.     This is an action for breach of contract and unjust enrichment arising out of the attempted conversion of AIG shares by SICO for its benefit, in violation of a long-standing agreement between AIG and SICO to retain and use such shares for the benefit of AIG and AIG employees.

2.     For over three decades, AIG and SICO have shared the same history and the same purpose: to make the AIG companies more profitable for the benefit of AIG, its shareholders, and its employees.  To ensure that this purpose was achieved, AIG and SICO shared common senior personnel.  Indeed, until recently, Maurice R. Greenberg served as the chairman of both the AIG and SICO boards of directors.  Additionally, SICO agreed to use a significant portion of its primary asset, AIG shares, in connection with a compensation plan for AIG employees.  SICO also agreed that current AIG executives would represent the majority of SICO's board of directors.

3.     By now attempting to utilize SICO's AIG shares for its benefit, as well as the benefit of certain current SICO directors, officers and other individuals associated with SICO, SICO is in breach of the agreements and commitments that have guided the relationship between SICO and AIG for over thirty years, and upon which AIG has justifiably relied to retain and recruit employees in order to promote AIG's continued growth and management stability.

4.     By deliberate design of past AIG executives and SICO directors, including Mr. Greenberg, since the 1970s, a significant portion of SICO's assets were set aside to be used only to promote the growth and management stability of AIG,

primarily through the provision of deferred compensation by SICO to long-time AIG employees, and to attract new employees.

5. Upon information and belief, SICO currently retains approximately 290 million restricted shares of AIG, with a current market value at well over $15 billion, which constitute approximately 90 percent of its assets. These shares are held in trust by SICO for the exclusive purpose of being distributed to AIG employees in the future. Indeed, upon information and belief, SICO's Articles of Incorporation mandate that not more than 20 percent in value of its acquired AIG shares may be used as credit support for SICO and its subsidiaries, except when necessary for the benefit of AIG and its subsidiaries (collectively, "AIG companies").

6. Beginning in the 1970s, following its mandate to promote AIG's long-term growth, SICO and AIG agreed that SICO would create a deferred compensation program (the "Deferred Compensation Program"), under which SICO is required to distribute AIG shares to AIG employees via two-year Deferred Compensation Profit Participation Plans ("DCPPPs"). Over the years, hundreds of AIG employees have participated in the Deferred Compensation Program.

7. Pursuant to this agreement between SICO and AIG, as of March 2005, SICO had awarded approximately 33,135,923 shares of AIG stock to AIG employees via the Deferred Compensation Program, more than 22,000,000 of which have not yet been distributed. SICO has admitted that it is obligated to hold those shares in trust for the Deferred Compensation Program participants and that it has no right to make use of those shares for its own benefit. At present, approximately 700 AIG employees participate in the Deferred Compensation Program.

8.     In order to effectively administer the Deferred Compensation Program, SICO and AIG have also agreed that AIG executives will serve on SICO's board of directors and AIG personnel will manage SICO's day-to-day operations.  In accordance with this agreement, prior to March 2005, the board of directors of SICO consisted of sixteen (16) current and former AIG company executives.

9.     Also in accordance with that agreement, prior to March 2005, SICO's twelve (12) voting shareholders consisted of then-current and former AIG executives.

10.     Upon information and belief, Mr. Greenberg is currently a voting shareholder of SICO and Chairman of SICO's board of directors.  Mr. Greenberg was also Chairman of SICO's board of directors while he was Chairman, CEO and director of AIG.

11.     Mr. Greenberg retired from his position as CEO of AIG in March 2005 and resigned as Chairman of AIG later the same month.  Until June 2005, Mr. Greenberg was a director of AIG.

12.     Beginning on March 31, 2005, the voting shareholders of SICO removed all current AIG executives from SICO's board.  As a result, no current AIG executives now serve on the SICO board.

13.     SICO has also recently indicated its intent to discontinue SICO's Deferred Compensation Program for AIG employees, and to use approximately 270 million of the approximately 290 million AIG shares subject to the Deferred Compensation Program (the "Deferred Compensation AIG Shares") for the benefit of SICO and certain current SICO directors, officers and other individuals associated with

9

SICO, several of whom were terminated or left AIG's employ after refusing to cooperate with state and federal authorities investigating AIG.

14.    AIG seeks by these Counterclaims to enforce its legal, equitable and contractual rights to have the Deferred Compensation AIG Shares owned by SICO utilized for the sole purpose for which they were intended: to provide deferred and retirement compensation with the aim of attracting and retaining valued AIG employees, and to benefit the long-term growth of AIG.

## Parties

15.    Counterclaim-Plaintiff AIG is a holding company that through its subsidiaries provides insurance, financial and retirement services in more than 130 countries and jurisdictions.  AIG is organized under the laws of Delaware, with its principal place of business in New York, New York.

16.    Upon information and belief, Counterclaim-Defendant SICO is organized under the laws of Panama, with its principal place of business in Hamilton, Bermuda.  Also upon information and belief, SICO maintains an office in Dublin, Ireland.

## Jurisdiction and Venue

17.    This Court has subject matter jurisdiction over AIG's counterclaims pursuant to 28 U.S.C. § 1332.

18.    Counterclaim-Defendant SICO transacts business in this District. The interstate trade and commerce involved and affected by the alleged violations of law is caused in part within this District.  Venue is therefore proper in this District under 28 U.S.C. § 1391.

10

## AIG and SICO's Shared History

19.     Beginning in East Asia in the early twentieth century, Cornelius Vander Starr established a network of insurance and insurance-related companies that eventually spanned the globe and became the American International group of companies. In an effort to organize his holdings, Mr. Starr formed two offshore entities: American International Underwriters Overseas, Inc. ("AIUO", subsequently renamed Starr International Company, Inc. ("SICO")) and American International Reinsurance Company, Inc. ("AIRCO"), and a Delaware corporation, C.V. Starr & Co., Inc. ("Starr"). SICO became the parent of Mr. Starr's foreign agency companies, while AIRCO became the parent of Mr. Starr's various insurance companies, and Starr was the parent of his domestic agency companies.

20.     Starting in the late 1960s, Mr. Starr and his protégé and successor Mr. Greenberg set out to organize the various companies under one holding company, AIG. In a series of transactions culminating in the 1978 merger of AIRCO into AIG, a significant portion of the assets held by SICO and Starr were exchanged for shares of AIG common stock. As a result, SICO held, initially indirectly through AIRCO and then directly after the AIG/AIRCO merger, approximately 30 percent of AIG's outstanding common stock, with a market value many times in excess of the book value of the insurance assets transferred. In 1970, SICO's shareholders set aside the excess of the market value over the book value of those assets, approximately $110 million, in a legal structure designed to ensure that the assets would be used to compensate AIG employees and could not be invaded for personal use by future generations of SICO directors, officers and other individuals associated with SICO.

11

21.    Over the years, the number of AIG's outstanding shares increased as AIG made further acquisitions in exchange for AIG common stock and as a result, SICO's percentage ownership of AIG common stock declined to its present 12 percent ownership. This AIG stock currently represents the overwhelming majority of SICO's assets.

### SICO's Structure

22.    Upon information and belief, SICO's own capital stock is divided into five primary categories:

(a)    one class of Voting Stock, consisting of up to 1,000 authorized shares, which have nominal value, pay a very small dividend and are divided among twelve individuals who hold ten shares each;

(b)    up to 10,000 authorized and outstanding shares of Common Stock, representing virtually all of SICO's economic value, held by a charitable trust (the "Trust");

(c)    up to 49,000 authorized shares of First Preferred Stock, which were issued and used for a predecessor compensation program for AIG and AIRCO employees;

(d)    up to 2,000,000 authorized shares of Junior Preferred Stock; and

(e)    up to 10,000 authorized shares of Senior Preferred Stock.

23.    Upon information and belief, if the Trust were to terminate, its ownership interest in SICO would be transferred to The Starr Foundation, a New York not-for-profit corporation. Upon information and belief, the Trust is structured so as not to terminate in the foreseeable future.

12

24.    Upon information and belief, SICO voting shareholders may not sell or assign their stock unless they are first offered to SICO at cost.

25.    Prior to March 2005, the voting shareholders of SICO were current and former executive officers or employees of AIG or one of its subsidiaries.  Upon information and belief, a majority of the current voting shareholders are former executive officers, or employees of AIG or one of its subsidiaries, including Maurice Greenberg, Edward Matthews, Michael Murphy and Howard Smith.

26.    Prior to March 2005, a majority of SICO's sixteen-member board of directors consisted of then-current executives of AIG companies, and for the most recent years, all of SICO's board consisted of then-current executives of AIG companies.  Upon information and belief, the Board currently consists of only former executives of AIG companies, including Messrs. Greenberg, Smith, Matthews and Murphy.

### The Deferred Compensation Program

27.    Mr. Greenberg and other AIG-SICO executives have always intended the Deferred Compensation AIG Shares to be used to promote AIG's long-term growth and to reward select AIG employees based on performance and loyalty to the AIG companies.

28.    In or around 1974, the board of directors of SICO, with the approval of its voting shareholders, a majority of whom were then-current executives of AIG companies, established the first DCPPP for AIG and AIRCO employees under the Deferred Compensation Program.

29.    Noting that the Deferred Compensation Program would "replace the … Preferred Stock series previously issued," the SICO board made clear that the

13

Deferred Compensation Program's "success … is directly dependent upon the success of all of us in continuing the growth of both AIG and AIRCO's earnings per share." Jul. 11, 1975 Letter from SICO Board.

30.     Prior to March 2005, the SICO board, a majority of which was then-current executives of AIG companies, was responsible for determining who would participate in the Deferred Compensation Program, and what allotment of shares they would receive. The administration of the Deferred Compensation Program is determined, at least in part, by operative statements set forth in SICO's charter, by-laws and other constituent documents.

31.     Each DCPPP covers a two-year period. Under each two-year plan, AIG employees would be allotted a certain number of AIG shares based on the amount of growth in AIG's earnings per share for those two years compared to the previous two-year period. Actual receipt of this AIG stock is contingent upon the AIG employees' remaining at AIG until the payout dates specified in the plan. The more recent DCPPPs also provide for additional shares to be credited to the AIG participant if the employee remains with AIG for eight years from the beginning of the two-year plan.

32.     Following notification that an AIG employee will be participating in the next two-year plan, the AIG employee receives a written contract for that plan. The contract provides that the participant "shall have allocated to such Participant's account a portion (as determined by the board of directors) of the appropriate voting common stock of AIG … set aside under the redemption value formula described in section 3 [of the contract]." The contract provides that receipt of this stock is in exchange for the participant's "continued contribution to the growth of SICO" and that

14

the stock "shall continue to be governed by and contingently reserved for the Participant in accordance with the Plan's terms and conditions until such Participant fulfills the employment conditions . . . ." Starr International Company, Inc. 2003/2004 Deferred Compensation Profit Participation Plan.

33.     As stated in AIG's 2001 Annual Report to shareholders, at a time when Mr. Greenberg was the Chairman of the AIG and SICO boards of directors, the value of the AIG shares held by SICO "was set aside in a legal structure carefully designed to ensure that the core assets could not be invaded for personal use by future generations of SICO owners." *Id.*

34.     The same report stated that "[b]y tying the contingent, long-term reward from SICO to the increase in AIG earnings since 1975, SICO seeks to develop a private company ownership mentality among the key plan participants." *Id.*

35.     Emphasizing the intention to utilize the value of the Deferred Compensation AIG Shares to "provide incentive to future generations of AIG management," the Annual Report further stated that "SICO's owners expect that these profit participation plans will continue for many generations to come." *Id.*

36.     Indeed, as the report concluded:

> These arrangements have nurtured a culture and philosophy of long-term commitment to the organization which may be unique among major U.S. corporations.   We intend to preserve the corporate culture fostered throughout this history and to adhere to the bedrock principles that have made this organization great.

*Id.*

**The Deferred Compensation Program Implements SICO's Purpose of Promoting
AIG's Long-Term Growth**

      37.    As summarized above, the primary purpose and structure of the Deferred Compensation Program was to ensure that: (1) a significant portion of the AIG shares held by SICO would be used to compensate future generations of AIG employees; and (2) SICO directors, officers and other individuals associated with SICO would not personally benefit from SICO's holdings of Deferred Compensation AIG Shares.

      38.    This purpose is made evident in SICO's Articles of Incorporation, public statements and filings made by SICO over the past three decades, the documents that form and implement the Deferred Compensation Program and in the DCPPPs themselves.

      39.    The opening section of each DCPPP, entitled "Purpose," makes clear that the Deferred Compensation Program was intended to mutually benefit both SICO and AIG employees, indefinitely:

> Whereas, a substantial amount of the profits of … SICO … are derived from dividends and capital appreciation of … AIG…;
>
> Whereas, certain key employees of SICO, AIG and their subsidiaries and affiliates … contribute substantially to the growth of the value of the assets and income of SICO;
>
> NOW, THEREFORE, SICO has devised the following Deferred Compensation Profit Participation Plan … to reward these individuals … and to assure their continued contribution to the growth of SICO.

Starr International Company, Inc. 2003/2004 Deferred Compensation Profit Participation Plan for Senior Partners.

40.     In the ensuing decades since the Deferred Compensation Program first began, this purpose has been repeatedly pronounced by AIG management and SICO directors.  For example, in 2001, Mr. Greenberg described SICO's historical purpose to an audience of DCPPP participants: "We decided that ... the difference between book value and market value [should be] placed in a newly created company named SICO ... and that difference was, of course, in AIG shares, the newly publicly traded company. We placed those shares in trust and developed an incentive plan that would permit shares to be taken from the trust to a shareholder account based on the performance of AIG...." May 4-6, 2001 Tr. of Speech by M. Greenberg.

41.     This agreement that SICO use its assets to spur AIG's growth has been reaffirmed by the current SICO directors, including former AIG director and senior executive officer Edward Matthews: "[T]his large capital value ... should not be used to enrich the then shareholders of SICO but instead preserved to provide incentives for succeeding generations." Mar. 31, 2005 Email from E. Matthews.

42.     Indeed, the SICO board and officers have, over the years, made this purpose explicitly public and transparent.  "SICO's primary purpose is to use [AIG's] shares to reward employees of [AIG] and its subsidiaries for their long-term service to [AIG]." Aug. 28, 2001 Holding by Texas Commissioner of Insurance, Official Order No. 01-0820. Or, as SICO vice president and secretary L. Michael Murphy explained in a draft letter to the U.S. Department of Labor, "SICO maintains the Plans ... for the purpose of providing deferred compensation to a select group of mnanagement [sic] and highly-compensated employees of AIG and its subsidiaries." Dec. 1992 Draft Letter from L. Murphy.

17

43.   Over the decades, SICO placed this corpus of stock in trust solely to fund the AIG Deferred Compensation Program and guaranteed AIG and AIG employees through its oral and written statements, as well as the conduct of SICO's directors and officers, that this corpus of assets will be distributed to AIG employees for as long as there remains stock to distribute.  Thus, SICO is expressly required and committed to fully distribute its cache of Deferred Compensation AIG Shares to AIG employees into the future:

- In his November 15, 1974 memorandum to all SICO shareholders outlining the proposed compensation plan in detail, SICO director Edward Matthews estimated the yearly payout of SICO's AIG stock and concluded, "At this rate it will take in excess of 200 years to exhaust the pool...." Nov. 15, 1974 Mem. from L. Murphy and E. Matthews.

- In a January 20, 1989 letter to DCPPP participants, Mr. Greenberg – who at the time was SICO and AIG board Chairman – stated that SICO "intended that similar Plans will be established every two years to reward those employees, who in the opinion of the Directors of SICO, are making the most outstanding contribution to the performance of [AIG]", and that there would be "an ongoing series of such Plans." Jan. 20, 1989 Letter from M. Greenberg.

- In his May 2001 speech to DCPPP participants, Mr. Greenberg promised, "SICO owns 13.62% or 318 million shares [of AIG]....It is unlikely that we would run out of shares to fund the above plan for decades, if ever." May 4-6, 2001 Tr. of Speech by M. Greenberg.

- In a December 16, 2002 memorandum, SICO vice-president and secretary L. Michael Murphy suggested that capping the number of shares "to be potentially utilized in any two year DCPP Plan series ... would ... assure AIG shareholders that the non-dilutive reward scheme would continue for at least 90 years." Dec. 16, 2002 Mem. from L. Murphy.

44.     The SICO board's course of conduct further evinces its commitment to paying out the Deferred Compensation AIG Shares to AIG employees. In 2003, for example, SICO's balance sheet reflected that the SICO Board had reserved 274 million AIG shares – representing 88% of SICO's holdings in AIG – for *future* compensation plans.

45.     The degree to which the SICO board considers those shares restricted and available only in accordance with the Deferred Compensation Program becomes even more clear from the board's actions with respect to the plan in place for 2001 to 2002. Share allocations are determined based on growth in AIG's earnings, and during the 2001-02 period, extraordinary events caused a decline in AIG's earnings.

46.     Based on AIG's performance during that period, the allocation formula in SICO's charter would not have allocated any Deferred Compensation AIG Shares to the DCPPP for that period.

47.     Nevertheless, SICO's board agreed to compensate AIG employees for that period. Because under the terms of the Deferred Compensation Program the already restricted shares could not be used for this purpose, the Board moved 21,474,738 AIG shares from a different account called "unrestricted surplus" into a contingent reserve account to be used both for that period and for any future period in which AIG did not meet the performance criteria specified in the charter. SICO then allocated a portion of these shares in the contingent reserve account to participants in the 2001-02 DCPPP. Thus, both the approximately 290 million restricted shares available for use to fulfill the requirements of its charter to compensate AIG employees based on specific

19

performance criteria and the remaining stock held in a contingent reserve account are ultimately designated for use as long-term incentive compensation for AIG employees.

48.  Thus, the manifest intent of all relevant parties was that SICO, at the very least, would continue distributing Deferred Compensation AIG Shares to AIG employees until the trust was depleted.

### The Deferred Compensation Program Benefits Both SICO and AIG

49.  Upon information and belief, the value of Deferred Compensation AIG Shares held by SICO in 1970 was approximately $110 million.

50.  According to the Annual Report referenced above, by 2001, SICO had distributed less than 8% of the total Deferred Compensation AIG Shares, which were reported to have had a market value of $23 billion.

51.  The tremendous increase in value of AIG stock has been the result of the contributions of AIG employees, including those in the Deferred Compensation Program. AIG employees, as a result of their participation in the Deferred Compensation Program, and in reliance that they would have the opportunity to receive additional shares in future DCPPPs, have remained employed at AIG and, as a result of this stability and their performance, AIG has enjoyed record success over the past decades, and thus, so has SICO.

52.  As noted in the above-referenced Annual Report, the "increase in value has been created in large measure by the outstanding efforts of the participants in these plans, and they have deservedly benefited from that growth." AIG 2001 Annual Report.

53.  The Deferred Compensation Program provides clear benefits to SICO, AIG and AIG employees. While AIG participants in the Deferred Compensation

20

Program have received stock through the DCPPPs, SICO – whose only substantial asset is AIG stock – has enjoyed exponential increases in the value of its assets due to the stability, longevity, and long-term AIG growth that the Deferred Compensation Program was intended to foster.  As Mr. Greenberg reasoned, "the better AIG does – the better SICO does – the better [DCPPP participants] do."  May 4-6, 2001 Tr. of Speech by M. Greenberg.

54.    The contractual nature of the Deferred Compensation Program can also be traced to the program's origins.  As described by Mr. Greenberg: "When the [Deferred Compensation Program] was originally developed, [SICO's shareholders] believed that since the founding shareholders voluntarily gave up the financial benefits they were entitled to by reason of the sale of their shares in the creation of AIG, we expressed that those we would name as participants in SICO [meaning DCPPP participants] would remain with the company and get the benefits that were accruing to them when they retired.  Those who decided to leave early, left behind their shares in SICO.  We thought this was only fair since we voluntarily gave up ownership to benefit others – we expected those others to remain in the company."  May 4-6, 2001 Tr. of Speech by M. Greenberg.

55.    The only conditions upon which distribution under the Deferred Compensation Program is dependent are the performance and continued AIG employment of DCPPP participants.  As Mr. Greenberg himself wrote in an April 9, 2002 letter to DCPPP participants, "your selection for future SICO plans will be *entirely dependent, as it always has been,* on your performance at AIG."  Apr. 9, 2002 Letter from M. Greenberg (emphasis added).

21

56.     The Deferred Compensation Program benefits not only SICO shareholders and AIG employees, but AIG shareholders too.  Specifically, by promoting stability among AIG's upper management around the world and creating growth-based incentives, AIG retained high performing executives and employees and AIG's bottom line increased.

57.     In reliance upon and consideration for the promise of Deferred Compensation Program payouts, AIG employees – including those receiving employment offers from competing firms – stayed employed, or committed to continue their employment, at AIG until such time they would receive the Deferred Compensation Program benefits.

58.     Further in reliance upon and consideration for the promise of the Deferred Compensation Program, AIG did not offer or implement other, available benefits programs for its employees, and instead utilized the Deferred Compensation Program as a primary vehicle for retaining highly-valued employees.

### The AIG-SICO Management Agreement

59.     In order to efficiently administer the Deferred Compensation Program, and to ensure that the purpose of the Deferred Compensation Program is achieved, SICO and AIG agreed that current officers of AIG companies will always serve on SICO's board of directors and manage the Deferred Compensation Program. Thus, SICO and AIG agreed that the Deferred Compensation Program would always be managed, and controlled by, current AIG personnel who would have both the incentive and the knowledge to make proper decisions regarding compensation of current and future AIG employees.

22

60.     Based on SICO's past representations and on the course of dealings between AIG and SICO over nearly three decades, an agreement exists between AIG and SICO that at least a majority of SICO's board will always be composed of the senior management of AIG so that AIG executives can manage the Deferred Compensation Program to accomplish its intended purposes.

61.     For the past thirty years, the Deferred Compensation Program has been controlled and managed by then-current AIG employees through their positions on SICO's board. Indeed, from 2000 through March 2005, all of SICO's board was comprised of then-current employees of AIG companies.

62.     Furthermore, Mr. Greenberg simultaneously served as Chairman and CEO of AIG and Chairman of SICO, which he could not have done if the purposes and interests of the two companies were not perfectly aligned.

63.     SICO and AIG's course of dealing generally also evidences this management agreement. In 1970, eight of the voting shareholders of SICO were officers of AIG companies. Over the years, additional officers of AIG companies were added to the roster of SICO voting shareholders.

64.     Both SICO and AIG received consideration for this agreement. In exchange for AIG's permitting its senior executives to serve as directors of a private company, SICO provided long-term incentive compensation to AIG's employees. SICO, in turn, received appreciation in its AIG stock and administration of the Deferred Compensation Program, among other benefits.

### SICO's Wrongful Conduct

65.     On March 14, 2005, Mr. Greenberg resigned from his position as Chief Executive Officer of AIG. On March 29, 2005, Mr. Greenberg announced his

resignation as Chairman of AIG's board of directors. On June 8, 2005, Mr. Greenberg resigned his position as an AIG director.

66.    Beginning on March 31, 2005, the voting shareholders of SICO ousted all current AIG officers from the SICO Board of Directors. Thus, upon information and belief, none of the current SICO directors are current officers of AIG companies, and all SICO directors are former employees of AIG companies, some of whom were terminated or left the employ of AIG companies after refusing to cooperate with state and federal authorities investigating AIG.

67.    In December 2004, AIG employees were informed of their unit allocations for the forthcoming 2005-2006 DCPPP. Despite SICO's obligation to do so, and this notification, SICO has failed to implement a DCPPP for 2005-06 as required under the Deferred Compensation Program.

68.    As evidenced by these actions, Mr. Greenberg, who is still chairman of SICO, and the other directors of SICO have demonstrated that they intend to manage SICO and to utilize the Deferred Compensation AIG Shares in a manner inconsistent with the longtime agreements and understandings between SICO and AIG.

69.    The removal by the SICO voting shareholders of all SICO directors that remain AIG executives breaches the agreement by SICO to act in the interests of AIG, and to retain employees of AIG companies on SICO's board.

70.    Upon information and belief, SICO intends to convert the Deferred Compensation AIG Shares into an investment vehicle and to use the AIG stock held by SICO to generate profits for itself and to benefit certain SICO directors, officers and

other individuals associated with SICO, again in violation of longtime agreements and understandings between SICO and AIG.

### FIRST COUNTERCLAIM
### Breach of Contract – Deferred Compensation Program

71.     AIG repeats and realleges each of the allegations contained in paragraphs 1 through 70 of these Counterclaims.

72.     AIG and SICO entered into agreements and understandings whereby SICO promised to use its AIG stock to fund a deferred compensation program for AIG employees. SICO and AIG instituted this program to promote stability among AIG's employees and, consequently, spur AIG's growth. AIG's stock price has grown significantly since SICO formally introduced the Deferred Compensation Program.

73.     Thus, SICO received clear consideration for establishing this program: the value of SICO's assets – AIG stock – has skyrocketed since the program's inception. AIG employees, in reliance on this commitment by SICO, remained employed at AIG. Because this program allowed AIG to retain key executives and increase its earnings, SICO's directors, officers and other individuals associated with SICO received direct benefits from the contract. Furthermore, SICO promised that the Deferred Compensation Program and each DCPPP would be administered until SICO had distributed all of its Deferred Compensation AIG Shares to AIG employees.

74.     SICO has recently indicated its decision to utilize the Deferred Compensation AIG Shares in a manner inconsistent with the Deferred Compensation Program, including but not limited to a failure to provide a DCPPP for 2005-06.

75.    SICO's refusal to fulfill its contractual obligation to continue to provide long-term compensation to AIG employees is a breach of its agreement and understanding with AIG.

76.    As a direct, foreseeable and proximate result of defendant SICO's material breach, AIG has been injured in an amount to be determined at trial.

## SECOND COUNTERCLAIM
### Breach of Contract – Management of the Deferred Compensation Program

77.    AIG repeats and realleges each of the allegations contained in paragraphs 1 through 76 of these Counterclaims.

78.    AIG and SICO agreed that a majority of SICO's board would consist of current AIG employees so that AIG executives would manage the Deferred Compensation Program.

79.    Under this agreement, both AIG and SICO benefited from AIG's administration of the Deferred Compensation Program.

80.    Beginning on March 31, 2005, the SICO voting shareholders ousted all current AIG employees from SICO's board, thereby removing all current AIG employees as directors at SICO.  Currently, no officer of SICO is a current employee of an AIG company.  SICO has therefore breached its agreement with AIG regarding the management of the Deferred Compensation Program.

81.    As a result of SICO's breach, AIG has been damaged.  Because monetary damages cannot fully compensate for SICO's wrongful conduct, specific performance is the only suitable remedy to rectify SICO's breach, and AIG seeks an order from this Court reinstating current AIG employees as directors of SICO.

## THIRD COUNTERCLAIM
### Unjust Enrichment

82.     AIG repeats and realleges each of the allegations contained in paragraphs 1 through 81 of these Counterclaims.

83.     For three decades, AIG and SICO enjoyed a confidential and fiduciary relationship that is manifest.

84.     The individuals who controlled SICO at the time the Deferred Compensation Program was created believed that it was not appropriate for them to benefit from the difference between the book and market value of AIG shares, and committed to ensure that the benefits would accrue over time to the benefit of AIG and its employees.   The successors to these individuals, who are now in control of SICO, cannot revoke this commitment and enrich SICO and SICO directors, officers and other individuals associated with SICO at the expense of AIG and its employees.

85.     The Deferred Compensation Program was created by SICO and AIG to support AIG's growth, largely by providing compensation to AIG employees on the condition that employees stay employed by AIG and meet performance expectations.

86.     SICO repeatedly promised AIG directors, officers, and employees that SICO would use its AIG stock to provide compensation for past, current and future AIG employees.  SICO also promised that management of SICO, and therefore control over the SICO assets reserved for the Deferred Compensation Program, would remain in the hands of current AIG employees.  In furtherance of this promise, SICO held the shares in trust, and limited the use of the shares to benefiting AIG, its subsidiaries and successors.

87.    SICO holds significant, identifiable assets that have been allocated specifically for the benefit and compensation of AIG employees.  SICO has specifically reserved these assets for the Deferred Compensation Program and payments of each DCPPP.

88.    AIG has transferred value to SICO through the efforts of its employees (both those receiving benefits from the SICO DCPPPs and those aspiring to do so), including nearly 30 years of increasing share value.

89.    SICO now seeks to retain for itself approximately 270 million of the approximately 290 million Deferred Compensation AIG Shares, worth over $15 billion, which AIG and SICO had agreed would be used exclusively to fund deferred compensation programs for AIG employees, or otherwise provide for AIG's needs.

90.    By terminating the Deferred Compensation Program, managing the Deferred Compensation AIG Shares in a manner that does not benefit AIG, and diverting the use of those shares to SICO directors, officers and other individuals associated with SICO, SICO will be unjustly enriched at the expense of AIG, AIG shareholders, and AIG employees.  The Deferred Compensation Program was expressly created to increase AIG's bottom line by promoting loyalty and stability among its most valued employees.  SICO directors are not permitted to use the Deferred Compensation AIG Shares at their whim.  Rather, these shares are restricted to benefit AIG and its employees, and should not be available for use at the unfettered discretion of the current generation of former AIG officers who now control SICO.  Such use of the shares would result in a windfall for SICO and SICO directors, officers and other individuals associated with SICO.

28

91.     This Court should not, in equity and good conscience, permit SICO

to retain for itself any of the 290 million shares of Deferred Compensation AIG Shares,

worth over $15 billion, which AIG and SICO had earmarked for distribution to AIG

employees and the benefit of AIG.

92.     As a direct, foreseeable and proximate result of defendant SICO's

unjust enrichment, AIG has been injured in an amount to be determined at trial.

### FOURTH COUNTERCLAIM
#### Constructive Trust

93.     AIG repeats and realleges each of the allegations contained in

paragraphs 1 through 92 of these Counterclaims.

94.     For three decades, AIG and SICO enjoyed a confidential and

fiduciary relationship that is manifest.

95.     The individuals who controlled SICO at the time the Deferred

Compensation Program was created believed that it was not appropriate for them to

benefit from the difference between the book and market value of AIG shares, and

committed to ensure that the benefits would accrue over time to the benefit of AIG and

its employees.  The successors to these individuals, who are now in control of SICO,

cannot revoke this commitment and enrich SICO and SICO directors, officers and other

individuals associated with SICO at the expense of AIG and its employees.

96.     The Deferred Compensation Program was created by SICO and

AIG to support AIG's growth, largely by providing compensation to AIG employees on

the condition that employees stay employed by AIG and meet performance expectations.

97.     SICO repeatedly promised AIG shareholders, directors, officers,

and employees that SICO would use its AIG stock to provide compensation for past,

current and future AIG employees. SICO also promised that management of SICO, and therefore control over the SICO assets reserved for the Deferred Compensation Program, would remain in the hands of current AIG employees. In furtherance of this promise, SICO held the shares in trust, and limited the use of shares to benefiting AIG, its subsidiaries and successors.

98.     SICO holds significant, identifiable assets that have been allocated specifically for the benefit and compensation of AIG employees. SICO has specifically reserved these assets for the Deferred Compensation Program and payments of each DCPPP.

99.     AIG has transferred value to SICO through the efforts of its employees (both those receiving benefits from the SICO DCPPPs and those aspiring to do so), including nearly 30 years of increasing share value.

100.    SICO now seeks to retain for itself approximately 270 million of the approximately 290 million shares of Deferred Compensation AIG Shares, worth over $15 billion, which AIG and SICO had agreed would be used exclusively to fund deferred compensation programs for AIG employees, or otherwise provide for AIG's needs.

101.    By reason of the foregoing, equity and good conscience require that the court impose a constructive trust in favor of AIG upon those assets specifically allocated by SICO to benefit AIG and to fund the Deferred Compensation Program, assets that would have been used to compensate AIG employees had SICO not willfully breached its promise. Unless a constructive trust is imposed, SICO will be unjustly enriched to the detriment of AIG and its shareholders.

30

## FIFTH COUNTERCLAIM
### Breach of Fiduciary Duty

102.   AIG repeats and realleges each of the allegations contained in paragraphs 1 through 101 of these Counterclaims.

103.   For three decades, AIG and SICO enjoyed a confidential and fiduciary relationship that is manifest and continues to this day.

104.   The individuals who controlled SICO at the time the Deferred Compensation Program was created believed that it was not appropriate for them to benefit from the difference between the book and market value of AIG shares, and committed to ensure that the benefits would accrue over time to the benefit of AIG and its employees.   The successors to these individuals, who are now in control of SICO, cannot revoke this commitment and enrich SICO and SICO directors, officers and other individuals associated with SICO at the expense of AIG and its employees.

105.   The Deferred Compensation Program was created by SICO and AIG to support AIG's growth, largely by providing compensation to AIG employees on the condition that employees stay employed by AIG and meet performance expectations.

106.   SICO repeatedly promised AIG directors, officers, and employees that SICO would use its AIG stock to provide compensation for past, current and future AIG employees.  SICO also promised that management of SICO, and therefore control over the SICO assets reserved for the Deferred Compensation Program, would remain in the hands of current AIG employees.  In furtherance of this promise, SICO held the shares in trust, and limited the use of shares to benefiting AIG, its subsidiaries and successors.

31

107.  SICO holds significant, identifiable assets that have been allocated specifically for the benefit and compensation of AIG employees.  SICO has specifically reserved these assets for the Deferred Compensation Program and payments of each DCPPP.

108.  SICO holds these assets strictly in a trust capacity for the benefit of AIG and its employees.  As a result, SICO owes a fiduciary duty to manage the Deferred Compensation AIG Shares in accordance with their specified purpose: to fund a deferred compensation program for AIG employees and benefit AIG.  By its own admission, SICO is not authorized to use these shares to enrich SICO or any of SICO's directors, officers or other individuals associated with SICO.

109.  SICO has breached its fiduciary duty owed to AIG by seeking to retain for itself approximately 270 million of the approximately 290 million Deferred Compensation AIG Shares, worth over $15 billion, which AIG and SICO had agreed would be held in trust and used exclusively to fund deferred compensation programs for AIG employees, or otherwise provide for AIG's needs.

110.  As a direct, foreseeable and proximate result of SICO's breach of fiduciary duty owed to AIG, AIG has been injured in an amount to be determined at trial.

### SIXTH COUNTERCLAIM
#### Conversion

111.  AIG repeats and realleges each of the allegations contained in paragraphs 1 through 110 of these Counterclaims.

112.  SICO was authorized to hold the Deferred Compensation AIG Shares only for the purpose of funding a deferred compensation program for AIG

employees. By its own admission, SICO is not authorized to use these shares for any other purpose. Yet, that is precisely what SICO now seeks to achieve.

113. SICO is currently exercising unauthorized dominion over 270 million of the approximately 290 million Deferred Compensation AIG Shares, valued at over $15 billion. Without authorization, SICO wrongfully assumed control of the Deferred Compensation AIG Shares by signaling its decision to utilize these shares in a manner inconsistent with the Deferred Compensation Program.

114. Accordingly, AIG has suffered damages and is entitled to a judgment returning control of the Deferred Compensation AIG Shares to AIG.

## SEVENTH COUNTERCLAIM
### Declaratory Judgment Act, 28 U.S.C. § 2201

115. AIG repeats and realleges each of the allegations contained in paragraphs 1 through 114 of these Counterclaims.

116. As evidenced by the counterclaims set forth above, there exists a real and actual controversy between AIG and SICO concerning the obligations of SICO to utilize the value of its Deferred Compensation AIG Shares towards the benefit of AIG and, in particular, the administration of the Deferred Compensation Program to promote the long-term growth of AIG.

117. In addition, there exists a real and actual controversy between AIG and SICO concerning the agreement between the parties that the Deferred Compensation Program would be managed by AIG employees through positions on SICO's board of directors.

118. This Court has jurisdiction of the subject matter of this claim pursuant to 28 U.S.C. § 2201.

33

119.   AIG brings a claim for a declaratory judgment to require SICO to comply with its obligations pursuant to the above agreements and understandings and seeks a declaration that SICO is required to use the Deferred Compensation AIG Shares for the benefit of AIG employees and AIG and that a majority of the SICO board must consist of AIG employees.

## RELIEF SOUGHT FOR THESE COUNTERCLAIMS

WHEREFORE, Counterclaim-Plaintiff AIG respectfully asks the Court to grant judgment in its favor and against Counterclaim-Defendant SICO:

A.  Dismissing the Complaint with prejudice;

B.  Awarding AIG damages sustained as a result of SICO's breach of contract regarding the Deferred Compensation Program, in an amount to be determined at trial plus interest;

C.  Awarding AIG damages sustained as a result of SICO's breach of contract regarding the management of the Deferred Compensation Program, in an amount to be determined at trial plus interest;

D.  Awarding AIG damages sustained as a result of SICO's unjust enrichment, in an amount to be determined at trial plus interest;

E.  Imposing a constructive trust on behalf of AIG for the approximately 290 million Deferred Compensation AIG Shares currently held by SICO;

F.  Ordering that AIG employees be reinstated on SICO's board of directors;

34

G. Awarding AIG damages sustained as a result of SICO's breach of fiduciary duties, in an amount to be determined at trial plus interest;

H. Awarding AIG damages sustained as a result of SICO's conversion of the Deferred Compensation AIG Shares, in an amount to be determined at trial plus interest;

I. Declaring that SICO is required to use the Deferred Compensation AIG Shares for the benefit of AIG employees and AIG;

J. Declaring that a majority of the SICO board must consist of AIG employees;

K. Awarding AIG punitive damages for SICO's actions, in an amount to be determined at trial plus interest;

L. Awarding AIG reasonable attorneys' fees and costs incurred in defending this action; and

M. Awarding AIG such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 27, 2005

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: _____/s/_____
    Martin Flumenbaum (MF-9067)
    Daniel J. Leffell (DL-6803)
    Roberta A. Kaplan (RK-3771)

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

35